**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **CAROLINA NINA BAUTISTA,** **Individually and as Parent and Natural Guardian of F.M., a Minor** | **CIVIL ACTION** **NO.  25-cv-3101** |
| *Plaintiff* | |
| v. | |
| **TEMPLE UNIVERSITY HOSPITAL INC., TEMPLE UNIVERSITY HEALTH SYSTEM INC.** | |
| v. | |
| **UNITED STATES OF AMERICA** | |
| *Defendants* | |

## AMENDED COMPLAINT – CIVIL ACTION
## MEDICAL PROFESSIONAL LIABILITY ACTION

Plaintiff, Carolina Nina Bautista, Individually and as Parent and Natural Guardian of F.M., a Minor, by and through her undersigned attorneys, Saltz Mongeluzzi Bendesky, P.C., brings this medical malpractice action against the above-named defendants and demands compensatory and punitive damages in an amount that exceeds the local arbitration limits, exclusive of pre-judgment interest, post-judgment interest and costs, upon the claims and causes of action set forth below.

## PARTIES AND JURISDICTIONAL FACTS

1.     Plaintiff, Carolina Nina Bautista, is an adult individual and citizen of the Commonwealth of Pennsylvania residing at the above-captioned address.

2.     Ms. Bautista is the parent and natural guardian of F.M., a minor.

3.     Ms. Bautista files this Complaint on behalf of her minor son, F.M., and on behalf of herself, individually and in her own right.

4.     F.M. was delivered on August 16, 2023 at Temple University Hospital in Philadelphia in the setting of profound fetal distress.

5.     F.M. now suffers from a catastrophic brain injury and global neurodevelopmental deficits and delays.

6.     F.M.'s neurologic devastation is the direct result of Defendants' egregiously substandard care in failing to properly manage his mother's labor and in failing to timely deliver F.M. in the face of signs and symptoms concerning for, among other things, fetal distress and an impending neurological catastrophe, which F.M. then went on to suffer.

7. F.M. was delivered in the setting of a progressively non-reassuring fetal heart tracings and other clinical findings that should have prompted an expedited delivery long before the baby crashed but inexplicably did not.

8. Throughout that time, Defendants knew, understood, and appreciated that the longer F.M. remained undelivered, his risk of catastrophic injury was substantially increased.

9. Nevertheless, and in conscious, knowing and deliberate disregard of that known risk, Defendants persisted in their delays and decided not to proceed with earlier delivery.

10. By the time he finally was delivered, F.M. was profoundly asphyxiated and in a near-death state.

11. His Apgar scores were an abysmal 3, 6, and 7 at, 1, 5, and 10 minutes of life, respectively.

12. His initial blood gases were critically low, evidencing an acute, profound hypoxia occurring at or around the time of delivery.

13. Initial head imaging at Temple showed a massive hemorrhagic stroke and intraventricular hemorrhage, both caused by F.M.'s *in utero* hypoxia and distress.

14. Shortly after birth, a call was made to St. Christopher's Children's Hospital, requesting immediate transfer of F.M. for a higher level of care.

15. At St. Christopher's, F.M. continued to be treated for his devastating brain injury, which progressed to hydrocephalus requiring shunt placement.

16. Defendants' conduct, as described herein, surpasses ordinary negligence and demonstrates a conscious, knowing, and reckless disregard for the continued health, well-being and safety of Ms. Bautista and F.M., entitling Plaintiff to the recovery of both compensatory and punitive damages.

17.     As a direct result of the egregiously substandard care provided by Defendants in the management of Ms. Bautista's labor and unconscionable delay in her delivery, F.M. suffered widespread, irreversible damage to his brain, and Ms. Bautista suffered catastrophic personal injuries.

18.     F.M.'s neurological injuries are permanent and will disable him in every aspect of his life, for the rest of his life.

19.     F.M. injuries and disabilities, and Ms. Bautista's injuries, would have been easily avoided with adherence to some of the most basic, minimum standards of medical and institutional care owed to them by Defendants, their agents, servants and employees, as described throughout this Complaint.

20.     With timely and proper management of his mother's labor and delivery, F.M. would not have suffered the catastrophic injuries he did, and he would be a healthy and neurologically intact little boy today.

21.     Defendant Temple University Hospital Inc. ("TUH") is a corporation or other legal entity organized and existing under and by virtue of the laws of the Commonwealth of Pennsylvania which at all relevant times owned, maintained, operated and/or controlled a hospital located at 3401 N. Broad Street in Philadelphia, Pennsylvania.  At all relevant times, TUH employed physicians, residents, physician extenders, nurses, midwives and other professional staff to provide medical care and services to patients, including Ms. Bautista and F.M. in particular.  The claims asserted against TUH are for the professional negligence and recklessness of its actual, apparent, and ostensible agents, servants, and employees who participated in and/or were responsible for the medical care, treatment, and management of Ms. Bautista and F.M. as described more particularly herein, including but not limited to Clinton A.

Turner, MD, Marigloria Maldonado-Puebla, MD, John Fitzsimmons, MD, Maeve Serino, MD, Sarina Dutta, MD, Diana Spalding, RN, Camryn Kobylinski, RN, Petra Whitcraft, CRNP, and Sherre Branch, RN, and whose acts and failures to act increased the risk of harm to F.M. and were substantial factors in causing his catastrophic injuries at birth.  Pursuant to Pa. R. Civ. P. 1042.3, a Certificate of Merit as to this Defendant will be filed separately with the Court.

22.    The claims against TUH also include a direct claim for corporate liability under *Thompson v. Nason*, 591 A.2d 703 (Pa. 1991), and its progeny of case law, including *Welsh v. Bulger*, 698 A.2d 581 (Pa. 1997) and *Whittington v. Woods*, 768 A.2d 1144 (Pa. Super. 2001), for the hospital's own negligent acts and omissions, as described herein.

23.    Defendant Temple University Health System Inc. ("TUHS") is a corporation or other legal entity organized and existing under and by virtue of the laws of the Commonwealth of Pennsylvania which at all relevant times owned, maintained, operated and/or controlled a hospital located at 3401 N. Broad Street in Philadelphia, Pennsylvania.  At all relevant times, TUHS employed physicians, residents, physician extenders, nurses, midwives and other professional staff to provide medical care and services to patients, including Ms. Bautista and F.M. in particular.  The claims asserted against TUHS are for the professional negligence and recklessness of its actual, apparent, and ostensible agents, servants, and employees who participated in and/or were responsible for the medical care, treatment, and management of Ms. Bautista and F.M. as described more particularly herein, including but not limited to Clinton A. Turner, MD, Marigloria Maldonado-Puebla, MD, John Fitzsimmons, MD, Maeve Serino, MD, Sarina Dutta, MD, Diana Spalding, RN, Camryn Kobylinski, RN, Petra Whitcraft, CRNP, and Sherre Branch, RN,  and whose acts and failures to act increased the risk of harm to F.M. and

were substantial factors in causing her catastrophic injuries at birth.  Pursuant to Pa. R. Civ. P. 1042.3, a Certificate of Merit as to this Defendant will be filed separately with the Court.

24.    The claims against TUHS also include a direct claim for corporate liability under *Thompson v. Nason*, 591 A.2d 703 (Pa. 1991), and its progeny of case law, including *Welsh v. Bulger*, 698 A.2d 581 (Pa. 1997) and *Whittington v. Woods*, 768 A.2d 1144 (Pa. Super. 2001), for the hospital's own negligent acts and omissions, as described herein.

25.    Defendants, TUH and TUHS are hereinafter collectively referred to as the "Temple Defendants."  Each allegation of direct corporate negligence in this Complaint applies equally to each of these defendants and to all of them jointly.  Likewise, all allegations of vicarious liability apply to each of them, individually, and to all of them jointly.

26.    The U.S Department of Health and Human Services ("HHS") has deemed Dr. Turner a federal employee.

27.    Accordingly, this matter involves a claim for personal injury brought against the United States of America under Section (b)(1) of the Federal Tort Claims Act (FTCA) 28 U.S.C § 1346. Jurisdiction is based on 28 U.S.C. § 1331 (Federal question) and Federal Tort Claims Act 28 U.S.C § 1346 et seq. (FTCA litigation), and 28 U.S.C. §1367 (Supplemental jurisdiction).

28.    On January 17, 2025, Plaintiff placed HHS on notice of a "claim for damage, injury, or death" via Standard Form 95.

29.    Accordingly, pursuant to 28 U.S.C. 2401(b), Plaintiff has exhausted her administrative remedies.

30.    Venue is properly laid within the United States District Court for the Eastern District of Pennsylvania pursuant to 28 U.S.C. § 1391(b)(2). All acts and omissions that form the subject matter of this action occurred in this judicial district.

31.     Defendant United States of America ("United States"), o/b/o Dr. Clinton Turner, an obstetrician/ gynecologist who was working at Temple University Hospital at the time of this incident.

32.     The claim asserted against Defendant United States in this action falls under the Federal Tort Claims Act, as set forth more fully herein, is for the professional negligence of its employee, actual agent, apparent agent, ostensible agent, workman, and/or servant, Dr. Turner.

33.     At all relevant times, Defendants and their agents, servants and employees were engaged in the practice of medicine, pursuing their respective specialties and/or other professional duties, and were obligated to use the professional skill and knowledge which they possessed, and to pursue their professions in accordance with reasonably safe and accepted standards of medical and professional care in general and in their specialties in particular, as well as institutional standards of care, in their care and treatment of Ms. Bautista and F.M. in August of 2023.

34.     At all relevant times, the Defendants acted directly and/or by and through their duly authorized actual, apparent and ostensible agents, servants and employees, including the individually-named defendants and other physicians, nurses and other professional staff identified in Ms. Bautista and F.M.'s medical records, who themselves were acting at all times within the course and scope of their actual and/or ostensible agency or employment with one or more of the defendants and under their exclusive control.

35.     Defendants are liable for the negligent and reckless acts and omissions of their actual and/or ostensible agents, servants and employees under theories of *respondent superior,* master servant, agency and right of control. The identities of those agents, servants and employees who were responsible for Ms. Bautista and F.M.'s care and whose conduct

contributed to the consequential delay in F.M.'s delivery, increased the risk of harm to and caused F.M.'s catastrophic injuries at and immediately after birth, as described herein, include the individually-named defendants and those providers whose conduct is described in this Complaint and in Ms. Bautista and F.M.'s Temple Hospital and associated medical records.

36.    Defendants are vicariously liable to Plaintiff for all damages sustained as a result of the negligent and reckless acts and omissions of persons whose conduct was under their supervision, control or right of control, and whose conduct increased the risk of harm to F.M. and caused his catastrophic injuries at and immediately after birth, and Ms. Bautista's personal injuries.

37.    At all relevant times, Ms. Bautista and F.M. were under the care, treatment and attendance of defendants, directly or indirectly, through their actual and ostensible agents, servants and employees who participated in their care, as described herein.

38.    At all relevant times, a physician-patient and nurse-patient relationship existed between Ms. Bautista and F.M. and each of the medical and professional service providers involved in their care, as described herein.

39.    At all relevant times, the Temple Defendants owed non-delegable legal duties directly to Ms. Bautista and F.M. pursuant to *Thompson v. Nason*, 591 A.2d 703 (Pa. 1991), and its progeny of case law, including *Welsh v. Bulger*, 698 A.2d 581 (Pa. 1997) and *Whittington v. Woods*, 768 A.2d 1144 (Pa. Super. 2001). These duties consisted of: (1) the duty to use reasonable care in the maintenance of safe and adequate facilities and equipment; (2) the duty to select and retain only competent physicians; (3) the duty to oversee all persons who practice medicine within their walls as to patient care; and (4) the duty to formulate, adopt, and enforce adequate rules and policies to ensure quality care for patients.

40.     Upon information and belief, at all relevant times, all defendants had actual and/or constructive knowledge of the negligent and reckless acts and omissions of their agents, servants and employees in the care, treatment and management of Ms. Bautista and F.M., as described herein.

41.     Ms. Bautista looked to and relied upon the knowledge, skill, training and advice of the defendants, their agents, servants and employees in connection with the medical care, treatment, management and other professional services provided to Ms. Bautista and F.M., or that should have been provided to them, but negligently and recklessly was not.

42.     Ms. Bautista looked to all defendants to provide her and F.M. with safe and proper care and to avoid conduct that would increase the risk of harm to them.

43.     Ms. Bautista did not select the physicians, nurses or other providers and professional staff responsible for her and F.M.'s care and treatment at Temple Hospital.

44.     Ms. Bautista and F.M.'s physicians, nurses and other providers were assigned to them by one or more of the defendants.

45.     At all relevant times, Ms. Bautista and F.M. believed that the physicians, nurses and other members of the medical team assigned to their care were employed by Temple Hospital.

46.     Defendants selected and assigned to Ms. Bautista and F.M. physicians, nurses and other professional service providers to make timely and appropriate decisions with respect to their care, who were neither properly skilled nor adequately trained to manage patients like Ms. Bautista and F.M.

47. The carelessness, negligence and recklessness of defendants and their agents, servants and employees, as described herein, increased the risk of harm to F.M. and caused her to suffer catastrophic injuries, as described in the medical records, which are incorporated herein.

48. The catastrophic and disabling injuries and losses suffered by F.M. were caused solely and exclusively by the negligent and reckless acts and omissions of defendants and their agents, servants and employees.

**OPERATIVE FACTS COMMON TO ALL COUNTS**

49. In August of 2023, Ms. Bautista was a 20-year-old G1 pregnant with a baby boy, whose estimated due date was November 6, 2023.

50. On August 16, 2023, Ms. Bautista presented to Temple Hospital at approximately 0708. She was 28 weeks and 2 days pregnant.

51. Ms. Bautista was moved into the emergency department at approximately 0718.

52. Her presenting complaint was contractions approximately 10 minutes apart.

53. She was placed on the fetal monitor at approximately 0725.

54. CRNP Whitcraft performed an OB ED History and Physical at approximately 0808.

55. CRNP Whitcraft did not document or interpret the fetal heart rate in her note.

56. CRNP Whitcraft performed a sterile vaginal exam, documenting fingertip dilation, 0% effacement, and baby at a -4 station.

57. CRNP Whitcraft assessed the patient has having a "concern for preterm labor, made cervical change."

58. CRNP Whitcraft's plan was to admit the patient to labor and delivery. In a negligent and reckless departure from the standard of care, no further plan was documented, no

obstetrician was consulted, no maternal fetal medicine specialist was consulted, no fetal heart rate was interpreted or documented, no interventions or treatment for the patient's preterm labor were provided, and no intervention or treatment for the baby's concerning fetal heart tracing was provided or even considered.

59.    At all relevant times, Dr. Turner was the attending obstetrician in labor and delivery responsible for the supervision, monitoring, evaluation, and management of Ms. Bautista's labor and delivery.

60.    CRNP Whitcraft filed her note at 1107, meaning the note was not saved into the patient's electronic medical record for over 3 hours after the OB ED History and Physical was allegedly performed, depriving any other providers seeing the patient or overseeing the labor and delivery and emergency medicine teams from seeing the patient's current status or the plan of care for 3 hours.

61.    At approximately 0943, CRNP Whitcraft documented another SVE, this time with 1 cm dilation and 50% effacement.  The patient continued to have contractions.  In other words, she was in labor.

62.    The patient's fetal heart tracings throughout the morning reflected concerning findings, including fetal tachycardia and decelerations.

63.    In a negligent and reckless departure from the standard of care, the providers attending to Ms. Bautista in the morning failed to call an obstetrician or maternal fetal medicine specialist to the bedside to evaluate the patient, and failed to perform intrauterine resuscitative measures.

64.    Based on the patient's gestational age, her concerning fetal heart tracings, and the fact that she was clearly in labor, the standard of care required that she: (1) be seen by an

obstetrician or maternal fetal medicine specialist, (2) be closely monitored, (3) be transferred onto the labor and delivery floor, (4) be provided steroids and other treatments for fetal lung maturity and neuroprotection, and (5) receive intrauterine fetal resuscitation to help improve her tracing.

65.    In a negligent and reckless departure from the standard of care, these interventions and treatments were not provided.

66.    Defendants knew or should have known that based on the patient's clinical picture and the fetal status, Ms. Bautista and F.M. were at an increased risk of catastrophic injury with such interventions and treatments.  Defendants knew or should have known that to maximize F.M.'s outcome, and to avoid devastating *in utero* hypoxia and other injuries, Ms. Bautista needed to be seen by a specialist, needed to be dosed with steroids, and intrauterine resuscitation needed to be performed.

67.    In a negligent and reckless deviation from the standard of care, no such specialist saw Ms. Bautista, and no such treatments and interventions were provided.

68.    Despite presenting preterm, with a concerning fetal heart tracing, and with signs of preterm labor, Ms. Bautista was not transferred into the labor and delivery floor until approximately 1015, over 3 hours after her initial arrival and over 2 hours after CRNP Whitcraft made the plan for admission.

69.    However, the chart also indicates that the order to admit Ms. Bautista to the inpatient service was not made until *1048*.

70.    At 1033, CRNP Whitcraft – not an obstetrician and not a maternal fetal medicine specialist – performed a history and physical for Ms. Bautista.

71.    CRNP Whitcraft documented that "Patient came in with complaints of contractions since 0500 and some thick mucus discharge.  Patient was very uncomfortable in OB Triage and on arrival was FT/L/H, on a recheck 90 minutes later (performed due to patient being so uncomfortable) patient was 1/50/-3."

72.    CRNP Whitcraft documented uterine contractions as occurring every 1-3 minutes.

73.    CRNP Whitcraft documented the fetal heart tracing with a baseline of 165, moderate variability, tachycardia, and accelerations.  CRNP Whitcraft made no documentation regarding decelerations.

74.    CRNP Whitcraft negligently and recklessly failed to appropriately interpret the fetal heart tracing, and should have documented and identified, *inter alia*, decelerations.

75.    In the setting of preterm labor, tachycardia, and decelerations, CRNP Whitcraft knew or should have known that urgent consultation with an obstetrician or maternal fetal medicine specialist was required, and knew or should have known that interventions needed to be urgently performed to reduce the baby's *in utero* hypoxia and improve the baby's outcome.

76.    In a negligent and reckless departure from the standard of care, CRNP Whitcraft failed to take any of these measures.

77.    CRNP Whitcraft documented the plan to "recheck cervix as clinically indicated," and to "consider beta, amp and mag if continued cervical change."

78.    CRNP Whitcraft signed her note at 1106.

79.    CRNP Whitcraft documented "Likely PTL [preterm labor]," "R/O chorioamnionitis."

80.    CRNP Whitcraft documented the plan for the patient to provide her with "ampi/magnesium sulfate, beta.  GBS sent."

81.     Dr. Turner did not sign CRNP Whitcraft's note until three hours and seventeen minutes later at 1350.

82.     CRNP Whitcraft allegedly consulted with Dr. Turner prior to signing her note at 1106, despite Dr. Turner not signing the note until 1350.

83.     Despite CRNP Whitcraft allegedly relaying to Dr. Turner that Ms. Bautista was in the setting of preterm labor, with tachycardia and decelerations, Dr. Turner failed to exam the patient, transfer her to the labor and delivery floor, provide appropriate steroids and antibiotics, and intrauterine fetal resuscitation to help improve her tracing.

84.     Dr. Turner knew or should have known that interventions needed to be urgently performed to reduce the baby's *in utero* hypoxia and improve the baby's outcome.

85.     At approximately 1128, it appears that Ms. Bautista was finally seen *for the first time* by a physician, PGY4 resident Dr. Marigloria Maldonado-Puebla.

86.     Dr. Maldonado documented a transfer of care note with a time of service at 1128, now over *4 hours since Ms. Bautista first presented to Temple Hospital*.

87.     Dr. Maldonado documented that the patient "reported leaking of fluid at 11:30am. She was noted to be leaking clear fluid.  On speculum, she had clear pooling of fluid."

88.     Dr. Maldonado documented the fetal heart rate as 170 bpm, moderate variability, positive accelerations, a deceleration at 0841 possible late vs variable, and that the patient was contracting every 2-3 minutes.

89.     Dr. Maldonado documented that the patient was admitted for preterm premature rupture of membranes at 1130, "concern for preterm labor, overall reassuring maternal and fetal status."

90.     Dr. Maldonado also documented "FHT currently with fetal tachycardia, s/p 1L NS in triage, additional NS bolus ordered now, however overall reassuring with moderate variability and accelerations."

91.     Dr. Maldonado ordered betamethasone for fetal lung maturity, magnesium sulfate for fetal neuroprotection, and antibiotics.

92.     Dr. Maldonado ordered an MFM consult.

93.     Dr. Maldonado signed her note at 1232.

94.     Almost two hours later, at 1401, Dr. Turner signed Dr. Maldonado's note.

95.     At approximately 1126, Ms. Bautista was seen by PGY1 intern Maeve Serino, MD who authored a maternal fetal medicine consult note.

96.     Dr. Serino documented the fetal heart rate with a baseline of 165 bpm, moderate variability, accelerations, intermittent variable decelerations with significant dropout and an isolated late deceleration.  Dr. Serino documented that the patient was contracting every 2-4 minutes.

97.     Dr. Serino documented that there was "reassuring maternal and stable fetal status."

98.     Dr. Serino documented the plan to give the patient betamethasone for fetal lung maturity and magnesium sulfate for fetal neuroprotection.

99.     Dr. Serino documented that "given high clinical suspicion for intra-amniotic infection in the s/o likely preterm labor, recommend appropriate antibiotic treatment with ampicillin and gentamicin."

100.    Dr. Serino documented that the patient was seen and her note was reviewed by PGY3 resident Dr. Sarina Dutta.

101.    Dr. Serino signed her note at 1311.

102.    Attending maternal fetal medicine physician John Fitzsimmons MD authored an attestation stating that he had seen the patient, but did not sign his note until 1541.  The time at which Dr. Fitzsimmons allegedly saw the patient is unclear from the chart.  Dr. Fitzsimmons noted that he agreed with the plan created by Dr. Serino.

103.    At approximately 1135, Ms. Bautista was provided her first dose of betamethasone.

104.    At approximately 1155, Ms. Bautista was provided her first dose of magnesium sulfate.

105.    At approximately 1146, Ms. Bautista was provided her first dose of ampicillin.

106.    At 1204, Nurse Spalding documented that Dr. Turner was "aware" that Ms. Bautista was requesting pain relief.

107.    At approximately 1345, Ms. Bautista was provided her first dose of gentamicin.

108.    In other words, Defendants failed to provide Ms. Bautista with appropriate steroids and antibiotics for **over four and a half hours from presentation.**  Defendants failure to provide Ms. Bautista with these basic and essential treatments reflects a negligent and reckless departure from the standard of care, when Defendants knew or should have known that the longer these treatments were withheld from Ms. Bautista and her unborn baby, the greater the risk of harm to her and her baby.

109.    Diana Spalding, RN documented that the patient's membranes spontaneously ruptured at approximately 1157.

- 16 -

110. From the time Ms. Bautista was last seen by a physician at 1126, until she was next seen by a provider at approximately 1446, the fetal heart tracings demonstrate concerning findings of fetal tachycardia, diminishing variability, and recurrent decelerations.

111. From 1126 to 1446, in a negligent and reckless departure from the standard of care, it does not appear that any of the nursing staff, primarily Nurse Spalding, alerted the physicians to the concerning findings on the fetal heart tracing.

112. From 1126 to 1446, in a negligent and reckless departure from the standard of care, it does not appear that any of the nursing staff, primarily Nurse Spalding, performed any intrauterine resuscitative measures to try and improve the baby's fetal heart tracing.

113. Defendants knew or should have known that the longer Ms. Bautista's baby remained undelivered in the setting of suspected chorioamnionitis, persistent fetal tachycardia, recurrent decelerations, and diminishing variability, the greater the risk of harm to the baby from *in utero* hypoxia and/or anoxia.

114. Despite watching the fetal heart rate continue to deteriorate over hours, Defendants, in a negligent and reckless departure from the standard of care, failed to expedite delivery and failed to perform a cesarean section to remove Ms. Bautista's baby from an increasingly hostile uterine environment.

115. At approximately 1451, it appears Dr. Maldonado returned to the patient's bedside to evaluate her cervix. Dr. Maldonado documented a SVE of 2/50%/-2 with a simplified Bishop score of 3.

116. Dr. Maldonado did not document the fetal heart tracing and did not author a note.

117. Dr. Maldonado knew or should have known that the fetal heart rate was continuing to deteriorate, and that F.M. needed to be immediately delivered.

118.    In a negligent and reckless departure from the standard of care, Dr. Maldonado missed this clear opportunity to deliver F.M., exposing him to hours more of *in utero* hypoxia and suspected chorioamnionitis.

119.    At approximately 1504, Dr. Maldonado began an Obstetrics Labor Progress Note.

120.    Dr. Maldonado documented "Patient very uncomfortable with contractions. Discussed plan of care with patient and MFM recommendation for delivery at this time due to suspected chorioamnionitis.  Patient verbalized understanding."

121.    Shockingly, despite persistent deterioration in the fetal heart rate and a diagnosis of suspected chorioamnionitis by the MFM team nearly 4 hours earlier, finally a recommendation was made for delivery.

122.    Defendants inexplicable, negligent, and reckless delay in delivery increased the risk of harm to F.M., and exposed him to ongoing intrauterine *hypoxia* and infection for hours on end.

123.    Dr. Maldonado further noted the fetal heart rate at 165-170 bpm, moderate variability, accelerations, and intermittent variable decelerations.

124.    She noted that the patient was contracting every 1 to 3 minutes.

125.    Dr. Maldonado negligently and recklessly failed to identify minimal variability and recurrent late decelerations in the fetal heart tracing which by now had persisted for hours.

126.    Dr. Maldonado documented the fetal heart tracing as "Category II with fetal tachycardia and intermittent variable decelerations."

127.    Dr. Maldonado documented that the patient was continuing to complain of overwhelming pain, an ordered an epidural.

128. Dr. Maldonado documented "S/p MFM consult: treat as suspected chorioamnionitis given persistent fetal tachycardia, recommend delivery at this time." Dr. Maldonado's plan was to continue antibiotics and "to start Pitocin for augmentation of labor after epidural placement."

129. Dr. Maldonado signed her note at 1526.

130. Dr. Turner did not sign Dr. Maldonado's note until 1653.

131. Anesthesia was at the patient's bedside for the epidural at approximately 1550.

132. The epidural was placed at approximately 1558.

133. A nursing note timed at 1615 by Nurse Spalding indicated "As Patient lying down after epidural placement, stated that she had to push and felt something in her vagina. Drs Mandem, Maldonado, and Turner called to bedside, pediatric team called to L&D. Infant delivered at 1614."

134. The medical chart does not clearly indicate whether, or at what time, Dr. Turner, despite being the attending obstetrician, saw Ms. Bautista prior to being called to her bedside before delivery.

135. At 1634, Dr. Maldonado authored an L&D Delivery Note.

136. Dr. Maldonado documented "Notified by RN that patient was feeling increased pressure. At bedside for cervical exam. Patient was called complete at 4:12p and began pushing. She delivered a male infant from the LOA presentation over an intact perineum at 4:14p."

137. Dr. Maldonado noted "Cord arterial blood gas sent: No."

138. Dr. Maldonado noted F.M.'s Apgar scores as 3, 6, and 7 at 1, 5, and 10 minutes of life respectively.

- 19 -

139.    F.M.'s neonatology admission note indicates arterial blood gas results with a pH of 6.82, a pCO2 of 142, a pO2 of 35, a bicarbonate of 23, and a base excess of -13.

140.    In other words, F.M. was profoundly acidotic at birth as a result of prolonged intrauterine hypoxia, caused by Defendants' unconscionable delay in treatment and delivery of Ms. Bautista.

141.    On Day of Life 2 at Temple Hospital, providers performed a head ultrasound of F.M. and documented a left frontoparietal infarct, likely hemorrhagic infarct, with mass effect on the left lateral ventricle, as well as suspected grade 1 IVH on the right.

142.    A follow up head ultrasound on 8/19, or Day of Life 3, showed a grade 4 IVH on the left and grade 3 IVH on the right.

143.    F.M. was ultimately diagnosed with hydrocephalus as a result of his massive brain bleeds and an ommaya reservoir was placed.

144.    Defendants' mismanagement of Ms. Bautista's labor and delivery, as described herein, exposed F.M. to an unnecessary and unreasonable risk of intrauterine hypoxia and birth asphyxia, which he then went on to suffer.

145.    F.M.'s catastrophic brain injuries and related disabilities are the direct result of Defendants' egregiously substandard care in failing to expedite delivery in the face of obvious non-reassuring fetal heart tracings, fetal intolerance to labor, depletion of oxygen reserves, and chorioamnionitis, as well as Defendants' repeated failures to provide Ms. Bautista with appropriate steroid and antibiotic treatment.

146.    Ms. Bautista's own catastrophic injuries are the direct result of egregiously substandard care, as described herein.

147.    Defendants knew, understood, and appreciated that delayed delivery in the face of progressively non-reassuring fetal heart tracings and chorioamnionitis were concerning for, among other things, fetal intolerance to labor and depletion of oxygen reserves.

148.    Defendants further knew that the longer the baby remained undelivered, his risk of suffering a neurological catastrophe *in utero* was substantially increased.

149.    Nevertheless, and in a reckless departure from the standard of care, Defendants made a conscious, deliberate decision ***not*** to expedite delivery and not to timely provide appropriate antibiotics and steroids despite those known risks.

150.    In compliance with the standard of care, F.M. should have been delivered long before his heart rate deteriorated to a catastrophic level.

151.    Had F.M. been timely delivered, as the standard of care required, he would not have suffered the brain injuries he did and he would not be in the neurologically devastated condition he is today.

152.    Defendants undertook and/or assumed a duty to provide Ms. Bautista with timely and proper medical care, treatment and advice in connection with her obstetrical management, including the timing and manner of her delivery, and to take appropriate measures to ensure her continued health and well-being as well as that of her unborn baby, and to avoid the risk of injury to them.

153.    Defendants failed to treat Ms. Bautista and F.M. with the appropriate knowledge, training, skill or advice, resulting in F.M.'s catastrophic injuries at birth, and Ms. Bautista's own personal injuries.

154. As a direct result of the negligence and recklessness of Defendants, as described herein, F.M. suffered the following injuries and complications, all of which would have been avoided with timely and proper care:

    a.  Intrauterine hypoxia;

    b.  Perinatal asphyxia;

    c.  Neonatal depression at birth;

    d.  Need for mechanical intubation;

    e.  Profound mixed acidosis;

    f.  Hemorrhagic stroke;

    g.  Bilateral intraventricular hemorrhage;

    h.  Global brain damage;

    i.  Global neurodevelopmental deficits, disabilities, and delays;

    j.  Impaired motor function;

    k.  Feeding difficulties;

    l.  Failure to thrive;

    m.  Neurocognitive deficits;

    n.  Need for invasive treatments and interventions;

    o.  Need for special therapies, services, and equipment;

    p.  Physical pain and suffering;

    q.  Anxiety and emotional distress;

    r.  Scarring and disfigurement;

    s.  Embarrassment and humiliation;

    t.  Loss of enjoyment of life's pleasures;

u. Inability to participate in and/or to perform activities of daily living;

v. Future impairment of earnings and earning capacity;

w. Past and future medical expenses for ongoing medical care, therapy, testing, equipment, surgeries, and other assistance required to treat, alleviate, minimize and/or otherwise treat her neurological injuries and related complications; and

x. Such other injuries documented in the medical records and evaluative reports of physicians, other health care professionals and therapists treating F.M. from birth to present, and into the future, as her care is and will be ongoing.

155. As a direct result of the negligence and recklessness of the Defendants, as described herein, Ms. Bautista suffered the following injuries and complications, all of which would have been avoided with timely and proper care:

a. Blood loss;

b. Need for invasive treatments and interventions;

c. Need for special therapies, services, and equipment;

d. Physical pain and suffering;

e. Anxiety and emotional distress;

f. Scarring and disfigurement;

g. Embarrassment and humiliation;

h. Loss of enjoyment of life's pleasures;

i. Inability to participate in and/or to perform activities of daily living;

j. Future impairment of earnings and earning capacity; and

k.  Past and future medical expenses for ongoing medical care, therapy, testing, equipment, surgeries, and other assistance required to treat, alleviate, minimize and/or otherwise treat her injuries and related complications

156.  The catastrophic and permanent injuries and losses of F.M. and Ms. Bautista were the direct result of the negligence and recklessness of Defendants, their agents, servants and employees, as described herein, and were not caused by any act or failure to act on the part of Ms. Bautista.

## COUNT I – PROFESSIONAL NEGLIGENCE

### *PLAINTIFF v. THE TEMPLE DEFENDANTS AND UNITED STATES OF AMERICA*

157.  The preceding paragraphs of this Complaint are incorporated here by reference.

158.  The Temple Defendants and Dr. Turner, individually, jointly, and severally, rendered medical and nursing care and treatment to Ms. Bautista and F.M. at Temple Hospital as more fully described at length throughout the complaint.  Such care was rendered by and through the Temple Defendants and the United States' actual, apparent and/or ostensible agents, servants, and employees, including: Clinton A. Turner, MD, Marigloria Maldonado-Puebla, MD, John Fitzsimmons, MD, Maeve Serino, MD, Sarina Dutta, MD, Diana Spalding, RN, Camryn Kobylinski, RN, Petra Whitcraft, CRNP, and Sherre Branch, RN, as well as others currently known to Defendants but unknown to Plaintiff.

159.  The Temple Defendants and the United States, acting directly and/or by and through their actual, apparent, and/or ostensible agents, servants and employees, including Dr. Turner, were negligent, careless, and reckless, and acted in violation of the applicable standards of care as set forth at length above any by, *inter alia*:

- 24 -

a. Failing to conform to the accepted standard of care in the timely and proper evaluation, diagnosis, treatment, and management of Ms. Bautista and F.M., at Temple Hospital on August 16, 2023, as described herein;

b. Failing to properly evaluate, diagnose, and manage Ms. Bautista's condition during her labor and delivery on August 16, 2023, as described herein;

c. Failing to properly monitor the fetal heart rate and uterine contraction activity;

d. Failing to properly interpret the fetal heart tracings and toco strips;

e. Failing to timely recognize and respond to signs and symptoms of fetal distress and intolerance for labor;

f. Failing to timely recognize and respond to signs and symptoms of chorioamnionitis;

g. Failing to timely recognize and respond to signs and symptoms of maternal complications during labor;

h. Failure to timely recognize and respond to non-reassuring features on the fetal heart tracings;

i. Failing to follow the hospital's electronic fetal heart monitoring policies;

j. Failing to follow the hospital's cesarean section policies;

k. Failing to follow the hospital's obstetrical emergency policies;

l. Failing to timely assess and re-assess fetal well-being during labor;

m. Failing to timely and properly evaluate the progress of labor;

n. Failing to timely, accurately and properly document the medical record;

o. Failing to adhere to the hospital's charting policies;

p. Failing to review the medical record;

- 25 -

q. Leaving the patient's bedside in the face of worrisome clinical findings and changes in the maternal and fetal condition;

r. Failing to come to the bedside to evaluate the patient;

s. Failing to formulate and execute a timely and appropriate plan for delivery;

t. Failing to reassess and modify the plan for delivery in the setting of signs and symptoms of maternal and fetal instability;

u. Failing to adhere to the plan for delivery;

v. Failing to timely respond to signs and symptoms of fetal distress;

w. Failing to properly assess F.M.'s risk for impending neurologic injury;

x. Failing to expedite delivery;

y. Failing to timely deliver F.M.;

z. Failing to properly supervise, oversee, and instruct the obstetrical nursing and midwife staff responsible for the monitoring, evaluation, and management of Ms. Bautista's labor and delivery;

aa. Failing to timely provide steroids for fetal neuroprotection and fetal lung maturity;

bb. Failing to timely provide antibiotics;

cc. Failing to timely and appropriately perform intrauterine resuscitative measures;

dd. Failing to properly supervise, oversee, and instruct the obstetrical resident staff responsible for the monitoring, evaluation, and management of Ms. Bautista's labor and delivery;

ee. Failing to timely obtain an MFM consult;

ff.  Failing to timely admit the patient to the labor and delivery service;

gg. Failing to timely notify a physician of concerning changes in the fetal heart rate;

hh. Failing to perform an amnioinfusion;

ii.  Failing to be familiar with and adhere to hospital policies relating to Ms. Bautista's obstetrical management, labor, and delivery; and

jj.  Failing to enforce hospital policies and procedures relating to Ms. Bautista's obstetrical management, labor, and delivery.

160.    The negligence and recklessness of Defendants, acting individually and by and through their agents, servants and employees, as described herein, increased the risk of harm to F.M. and was a substantial factor in causing his catastrophic injuries and losses, and Ms. Bautista's catastrophic personal injuries.

161.    The Temple Defendants and the United States are derivatively liable for the negligent and reckless acts and omissions of their aforementioned employees and/or agents, including Dr. Turner, and those other individuals under principles of *respondeat superior*, master-servant, vicarious liability, agency and/or right of control.

162.    Defendants, individually and by and through their agents, servants and employees, acted and failed to act in conscious disregard and with a deliberate, reckless indifference to the health, safety, and well-being of Ms. Bautista and F.M., as described throughout this Complaint.

163.    At all relevant times, Defendants were aware of and allowed the negligent and reckless acts and omissions of their agents, servants, and employees to occur, as described herein.

164. As a direct and proximate result of the negligence and recklessness of Defendants, F.M. and Ms. Bautista have suffered catastrophic and permanent injuries, damages, and other losses, as described herein.

**WHEREFORE**, Plaintiff demands judgment against Defendants and an award of compensatory and punitive damages in an amount in excess of Fifty Thousand Dollars ($50,000.00) in damages, and in excess of the prevailing arbitration limits, exclusive of punitive damages, prejudgment interest, post-judgment interest, and costs.

## <u>COUNT II – CORPORATE NEGLIGENCE</u>

### *PLAINTIFF v. THE TEMPLE DEFENDANTS*

165. The preceding paragraphs of this Complaint are incorporated here by reference.

166. In addition to its derivative and vicarious liability for the negligent and reckless acts and omissions of its agents, servants, and employees, as described throughout this Complaint, the Temple Defendants further owed direct and non-delegable duties to Ms. Bautista and F.M. under the tenets set forth in *Thompson v. Nason*, 591 A.2d 703 (Pa. 1991), and its progeny of case law, including *Welsh v. Bulger*, 698 A.2d 581 (Pa. 1997) and *Whittington v. Woods*, 768 A.2d 1144 (Pa. Super. 2001).

167. The Temple Defendants' duties included: (1) a duty to use reasonable care in the maintenance of safe and adequate facilities and equipment; (2) a duty to select and retain only competent physicians; (3) a duty to oversee all persons who practice medicine within its walls as to patient care; and (4) a duty to formulate, adopt, and enforce adequate rules and policies to ensure quality care for patients.

168. The Temple Defendants had a duty to their patients, and to Ms. Bautista and F.M. in particular, to exercise reasonable care in the appointment and reappointment of its physicians,

residents, nurses and other professional staff, including but not limited to attending obstetricians granted privileges to manage labor and delivery.

169. The Temple Defendants had a duty to their patients, and to Ms. Bautista and F.M. in particular, to provide them with reasonable and competent medical care and other professional services and to avoid conduct that would increase the risk of harm to them.

170. It is believed and therefore averred that one or more of the physicians, including but not limited to Dr. Turner, residents, nurses and/or professional staff involved in Ms. Bautista's and F.M.'s care, as described herein, did not possess the requisite skill, experience, and training to render proper care, treatment and services to them.

171. It is believed and therefore averred that the Temple Defendants were negligent and reckless in failing to properly determine the qualifications and proficiencies of the medical staff responsible for the care, treatment and management of Ms. Bautista and F.M., as described herein, including failing to appropriately evaluate, monitor, and respond to Dr. Turner's prior performance and litigation history related to his obstetrical care.

172. The Temple Defendants knew or should have known that the medical staff who participated in the care and treatment of Ms. Bautista and F.M. were not qualified to provide competent medical care and treatment to patients like them, including knowledge of Dr. Turner's prior involvement in litigation alleging and proving substandard obstetrical care resulting in neonatal injury.

173. At all relevant times, the Temple Defendants had actual and/or constructive knowledge of the care and treatment provided, or negligently and recklessly not provided, to Ms. Bautista and F.M., including knowledge of the care rendered by Dr. Turner as the attending obstetrician.

174.    At all relevant times, the Temple Defendants maintained and enforced a two-team obstetrical care structure within the Labor and Delivery unit, whereby attending obstetricians were divided into separate teams that treated different categories of patients based on prenatal care source, and Plaintiff was assigned to the team on which Dr. Turner served as the attending obstetrician because she received prenatal care at a federally funded clinic, rather than being treated by another attending obstetrician.

175.    The negligence and recklessness of the Temple Defendants which serves as a basis for Defendants' own direct corporate liability, consisted of one or more of the following:

a. failing to have physicians, residents and nurses appropriate in number, training and/or experience to make timely and appropriate decisions regarding the management and timing of Ms. Bautista's labor and delivery, F.M.'s condition *in utero* and the need for expedited delivery, as described herein;

b. failing to select and retain physicians, residents and nurses competent in the timely and appropriate monitoring, assessment and management of Ms. Bautista's labor and delivery, as described herein, including continuing to credential and retain Dr. Turner despite known risks associated with his obstetrical decision-making;

c. failing to ensure that Ms. Bautista and F.M. received timely and appropriate care from fully and properly trained and experienced physicians, residents and nurses;

d. failing to formulate, adopt and enforce adequate policies and procedures to prevent adverse outcomes such as that suffered by Ms. Bautista and F.M., including those relating to:

i. electronic fetal heart rate monitoring, including but not limited to definitions of terms, indications for physician notification and management of non-reassuring fetal heart rate patterns;

ii. diagnosis, assessment and management of intrauterine fetal distress;

iii. diagnosis, assessment and management of chorioamnionitis;

iv. diagnosis, assessment and management of preterm labor;

v. indications for the performance of a cesarean delivery;

vi. indications for and the timing of urgent, emergent, and stat cesarean deliveries;

vii. indications for the initiation of intrauterine resuscitation measures;

viii. indications for administration of labor steroids;

ix. indications for administration of antibiotics;

x. charting and documentation of the medical record;

xi. availability of attending and on-call physicians;

xii. availability of attending and on-call physicians trained in obstetrics and gynecology;

xiii. availability of attending and on-call physicians credentialed to perform cesarean sections;

xiv. availability of attending on on-call maternal fetal medicine specialists;

xv. sharing of the medical chart across providers;

      xvi.   sharing of the medical chart across provider groups;

     xvii.   review of the medical chart across providers;

   xviii.   review of the medical chart across provider groups;

     xix.   treatment of high-risk patients by qualified medical professionals; and

      xx.   chain of command.

e. failing to oversee all persons who practice medicine within its walls as to patient care to ensure that the physician, resident and nursing staff responsible for the monitoring, evaluation, diagnosis and management of Ms. Bautista's labor and delivery and F.M.'s condition *in utero* were appropriately and adequately supervised;

f. failing to oversee all persons who practice medicine within its walls as to patient care to ensure the timely and appropriate monitoring, assessment, diagnosis and management of Ms. Bautista's labor and delivery and F.M.'s condition *in utero;* and

g. failing to use reasonable care in the maintenance of safe and adequate facilities and equipment for the treatment of Ms. Bautista and F.M., including on the Labor & Delivery unit, to include all equipment necessary for their timely, safe and appropriate monitoring, assessment, diagnosis and medical management, as described herein.

176. In violation of their non-delegable corporate duties and accepted standards of institutional care, the Temple Defendants did not have adequate policies or procedures in place to ensure the safety of patients like Ms. Bautista and F.M., including policies governing

credentialing, recredentialing, and continued privileging of attending obstetricians such as Dr. Turner.

177. The Temple Defendants knew or should have known that it did not have adequate policies or procedures in place, as described above.

178. To the extent that they did have such policies and procedures in place, the Temple Defendants failed to enforce them.

179. To the extent that such policies and procedures did exist, the Temple Defendants knew or should have known that its physicians, residents, and nursing staff either were not familiar with them and/or failed to follow them in practice, thereby increasing the risk of harm to patients such as Ms. Bautista and F.M.

180. The Temple Defendants knew or should have known that its physicians, residents and nursing staff did not possess the adequate training, skill or knowledge in the management of patients like Ms. Bautista and F.M.

181. The Temple Defendants knew or should have known that it failed to provide its physicians, residents and nursing staff with adequate and proper training, skill or knowledge in the management of patients like Ms. Bautista and F.M.

182. The Temple Defendants knew or should have known that its nurses and residents were not adequately supervised by the attending physician staff.

183. At all relevant times, the Temple Defendants knew, understood, and appreciated the risk of catastrophic and potentially life-threatening injury to patients such as F.M. and knowingly and deliberately acted or failed to act in conscious disregard of and with reckless indifference to the health, well-being and safety of F.M., as described throughout this Complaint

184.    The foregoing corporate negligence and recklessness of the Temple Defendants increased the risk of harm to F.M. and Ms. Bautista and caused them to suffer the catastrophic and permanent injuries, damages, and other losses they did, which would have been avoided with timely and proper care.

**WHEREFORE**, Plaintiffs demand judgment against Defendants and an award of compensatory and punitive damages in an amount in excess of Fifty Thousand Dollars ($50,000.00) in damages, and in excess of the prevailing arbitration limits, exclusive of punitive damages, prejudgment interest, post-judgment interest, and costs.

<u>**COUNT III – NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS**</u>
*PLAINTIFF v. ALL DEFENDANTS*

185.    The preceding paragraphs of this Complaint are incorporated here by reference.

186.    Due to the negligence and recklessness of all Defendants and the resulting injuries suffered by her son, F.M., the Plaintiff-parent, Carolina Nina Bautista, has experienced significant mental anguish, anxiety, upset, severe emotional distress and related symptoms giving rise to their own individual claims for damages under the doctrine of *Sinn v. Burd*, 404 A.3d 672 (Pa. 1979) and its progeny of case law, including *Love v. Cramer*, 606 A.2d 1175, 1177 (Pa. Super.), *app. denied*, 621 A.2d 580 (Pa. 1992).

187.    Ms. Bautista was present for, contemporaneously witnessed and experienced first-hand the negligent and reckless acts and omissions of Defendants and their agents that resulted in the catastrophic brain damage and neurodevelopmental sequelae suffered by her son, F.M., as described herein.

188.    At all relevant times, Ms. Bautista was intimately connected with, contemporaneously experienced and observed the injuries suffered by F.M., *in utero*, during the time that he should have been delivered, but negligently and recklessly was not.

189.    Ms. Bautista was aware of and contemporaneously experienced Defendants' failure to timely deliver F.M. between the time that urgent delivery was indicated based on Ms. Bautista's maternal condition, as the standard of care required, and when F.M. was delivered nearly lifeless in the setting of infection and fetal distress.

190.    Ms. Bautista experienced the shock and trauma of witnessing her previously healthy infant's emergent delivery in a near-death state and the interventions required to resuscitate him.

191.    Ms. Bautista witnessed and experienced first-hand the extraordinary care and services F.M. has required during the first months of his life to treat his catastrophic brain injuries and associated deficits, all of which were caused by Defendants' negligence and recklessness, as described herein.

192.    As a direct result of having witnessed the negligent and reckless acts and omissions of Defendants and the consequences of their failures, the Plaintiff-parent has experienced and will continue to experience severe emotional distress and physical manifestations of that distress, including headaches, stomach upset, difficulty sleeping, apprehension, impaired concentration and other stress-induced physical and emotional injuries.

**WHEREFORE**, Plaintiff demands judgment against all Defendants an award of compensatory and punitive damages in an amount in excess of Fifty Thousand Dollars ($50,000.00) in damages, and in excess of the prevailing arbitration limits, exclusive of prejudgment interest, post-judgment interest, and costs

**SALTZ MONGELUZZI BENDESKY, P.C.**

BY: */s/ Aidan B. Carickhoff*
   ROBERT J. MONGELUZZI
   AIDAN B. CARICKHOFF
   OLIVIA S. SZUMSKI
   *Attorneys for Plaintiffs*

# VERIFICATION

The averments or denials of fact contained in the foregoing are true based upon the signer's personal knowledge or information and belief. If the foregoing contains averments which are inconsistent in fact, signer has been unable, after reasonable investigation, to ascertain which of the inconsistent averments are true, but signer has knowledge or information sufficient to form a belief that one of them is true.

**SALTZ MONGELUZZI BENDESKY, P.C.**

BY:   */s/ Aidan B. Carickhoff*
      ROBERT J. MONGELUZZI
      AIDAN B. CARICKHOFF
      OLIVIA S. SZUMSKI
      *Attorneys for Plaintiffs*

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **CAROLINA NINA BAUTISTA,** **Individually and as Parent and Natural Guardian of F.M., a Minor** | **CIVIL ACTION** |
| *Plaintiff* | **NO.  25-cv-3101** |
| v. | |
| **TEMPLE UNIVERSITY HOSPITAL INC., TEMPLE UNIVERSITY HEALTH SYSTEM INC.** | |
| v. | |
| **UNITED STATES OF AMERICA** | |
| *Defendants* | |

## CERTIFICATE OF MERIT AS TO: DEFENDANT UNITED STATES OF AMERICA/ CLINTON TURNER, M.D.

I, Aidan B. Carickhoff, Esquire, certify that: An appropriate licensed professional has supplied a written statement to the undersigned that there is a basis to conclude that the care, skill or knowledge exercised or exhibited by this Defendant in the treatment, practice or work that is the subject of the Complaint, deviated from or fell outside of acceptable professional standards, and that such conduct was a cause in bringing about the harm and/or increasing the risk of harm.

The claim that the above Defendant deviated from acceptable professional standards is also based on allegations that other licensed professionals for whom these Defendants are responsible, and vicariously liable, deviated from acceptable professional standards and that an appropriate licensed professional has supplied a written statement to the undersigned that there is a basis to conclude that the care, skill or knowledge exercised or exhibited by the other licensed

- 38 -

professionals in the treatment, practice or work that is the subject of the Complaint, fell outside

acceptable professional standards and that such conduct was a cause in bringing about the harm

and/or increasing the risk of harm.

**SALTZ MONGELUZZI BENDESKY, P.C.**

BY:   */s/ Aidan B. Carickhoff*
          ROBERT J. MONGELUZZI
          AIDAN B. CARICKHOFF
          OLIVIA S. SZUMSKI
          *Attorneys for Plaintiffs*